**RECORD NO. 24-1342**

**UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

RE CARROLL MANAGEMENT COMPANY, CIP CONSTRUCTION COMPANY, CARROLL INDUSTRIAL DEVELOPMENT US, LLC, ALARIS HOMES, INC., SNAP PUBLICATIONS, LLC, and CARROLL INVESTMENT PROPERTIES, INC.,

*Plaintiffs-Appellants*,

v.

DUN & BRADSTREET, INC.,

*Defendant-Appellee*,

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

**BRIEF OF PLAINTIFFS-APPELLANTS**

Eric M. David
Andrew L. Rodenbough
Pearson G. Cost
BROOKS, PIERCE, MCLENDON,
 HUMPHREY & LEONARD, L.L.P.
Post Office Box 1800
Raleigh, North Carolina 27602
Telephone: (919) 839-0300
*Attorneys for Plaintiffs-Appellants*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. __24-1342__      Caption: __RE Carroll Management Co. et al. v. Dun & Bradstreet, Inc.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Carroll Investment Properties, Inc.__
(name of party/amicus)

_____

who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.   Is party/amicus a publicly held corporation or other publicly held entity?   ☐YES ☑NO


2.   Does party/amicus have any parent corporations?   ☐YES ☑NO
     If yes, identify all parent corporations, including all generations of parent corporations:


3.   Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?   ☐YES ☑NO
     If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?                    ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)     ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?                    ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?            ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Eric M. David                    Date:        05/02/2024

Counsel for: Appellant Carroll Investment Properties, Inc.

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. 24-1342      Caption: RE Carroll Management Co. et al. v. Dun & Bradstreet, Inc.

Pursuant to FRAP 26.1 and Local Rule 26.1,

CIP Construction Company
(name of party/amicus)


who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.   Is party/amicus a publicly held corporation or other publicly held entity?   ☐YES ☑NO


2.   Does party/amicus have any parent corporations?   ☐YES ☑NO
     If yes, identify all parent corporations, including all generations of parent corporations:


3.   Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?   ☐YES ☑NO
     If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Eric M. David          Date: 5/2/2024

Counsel for: Appellant CIP Construction Company

- 2 -

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 24-1342     Caption: RE Carroll Management Co. et al. v. Dun & Bradstreet, Inc.

Pursuant to FRAP 26.1 and Local Rule 26.1,

RE Carroll Management Company
(name of party/amicus)

_____

who is _____ Appellant _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity?   ☐YES ☑NO

2.  Does party/amicus have any parent corporations?   ☐YES ☑NO
    If yes, identify all parent corporations, including all generations of parent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?   ☐YES ☑NO
    If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Eric M. David          Date: 05/02/2024

Counsel for: Appellant RE Carroll Management Co.

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __24-1342__      Caption: __RE Carroll Management Co. et al. v. Dun & Bradstreet, Inc.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Snap Publications, LLC__
(name of party/amicus)

_____

who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.  Does party/amicus have any parent corporations?  ☐YES ☑NO
    If yes, identify all parent corporations, including all generations of parent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐YES ☑NO
    If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?    ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Eric M. David                    Date:    05/02/2024

Counsel for: Appellant Snap Publications, LLC

- 2 -

[ Print to PDF for Filing ]

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. __24-1342__        Caption: __RE Carroll Management Co. et al. v. Dun & Bradstreet, Inc.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Alaris Homes, Inc.__
(name of party/amicus)

_____

 who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO


2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:




3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?   ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)   ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?   ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?   ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Eric M. David                    Date:        5/2/2024

Counsel for: Appellant Alaris Homes, Inc.

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. 24-1342          Caption: RE Carroll Management Co. et al. v. Dun & Bradstreet, Inc.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Carroll Industrial Development US, LLC
(name of party/amicus)


who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.  Does party/amicus have any parent corporations?  ☐YES ☑NO
    If yes, identify all parent corporations, including all generations of parent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐YES ☑NO
    If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct
      financial interest in the outcome of the litigation?          ☐YES ☑NO
      If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
      If yes, identify any publicly held member whose stock or equity value could be affected
      substantially by the outcome of the proceeding or whose claims the trade association is
      pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?          ☐YES ☑NO
      If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
      party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
      caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
      corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
      If yes, the United States, absent good cause shown, must list (1) each organizational
      victim of the criminal activity and (2) if an organizational victim is a corporation, the
      parent corporation and any publicly held corporation that owns 10% or more of the stock
      of victim, to the extent that information can be obtained through due diligence.

Signature: __/s/ Eric M. David_____    Date: ____5/2/2024_____

Counsel for: _Appellant Carroll Industrial Development US, LLC_

- 2 -

[Print to PDF for Filing]

# TABLE OF CONTENTS

TABLE OF CONTENTS .............................................................. i

TABLE OF AUTHORITIES ...................................................... iv

JURISDICTIONAL STATEMENT ...........................................1

STATEMENT OF ISSUES .........................................................1

STATEMENT OF THE CASE......................................................2

    I.   D&B markets its credit reporting business as accurate, reliable, and based on factual information. ........................................................2

    II.  The structure and organization of the Credit Reports imply reliance on underlying facts and data. .....................................................4

    III. D&B creates false Credit Reports regarding the Carroll Companies. ..........7

    IV. D&B's uses the false, negative Credit Reports to coerce the Carroll Companies into *quid pro quo* arrangements to "repair" their ratings.........11

    V.  The district court dismisses the Carroll Companies' initial complaint with prejudice and denies them an opportunity to amend. .........................15

SUMMARY OF ARGUMENT .............................................17

ARGUMENT ..............................................................................19

    I.   The standard of review on appeal is *de novo*. ..............................................19

    II.  The Proposed Amended Complaint was not futile because the Carroll Companies sufficiently alleged that D&B's Credit Reports include and imply actionable false assertions of fact. ............................................21

        A. The district court misapplied the "plausibility" standard. ...................21

        B. An ordinary reader would understand the Credit Reports to be defamatory *per se* ...................................................................23

i

C.  The Credit Reports include false factual assertions regarding outstanding lawsuits, judgments, and liens............................................26

D.  The district court misapprehended the constitutional line between fact and opinion....................................................................28

    i.   D&B's entire business model relies on implied facts underlying the ratings. ..............................................31

    ii.  The text of the Credit Reports implies the existence of facts underlying the ratings.....................................33

    iii. The Carroll Companies have sufficiently alleged that the facts implied by the Credit Reports are false............................36

    iv.  Despite implications to the contrary, there are no facts supporting the Credit Reports. ...................................38

III. The Credit Reports' underlying falsities are not corrected by vague language and disclaimers. ...........................................39

    A.  D&B's disclaimer does not remedy the defamatory import of its false statements. ...............................................39

    B.  Vague labels do not remedy the defamatory import............................43

IV. The Proposed Amended Complaint plausibly alleged claims for unfair and deceptive trade practices. ......................................45

    A.  Plaintiffs' Fifth Claim for Relief stands with the libel claim. .............45

    B.  Plaintiffs' Sixth Claim for Relief was not futile. ................................46

    i.   D&B's conduct was in or affecting commerce........................46

    ii.  D&B's conduct was unfair or deceptive....................................46

    iii. D&B's conduct caused actual injury to the Carroll Companies....................................................................48

ii

V.  The original Complaint plausibly alleged claims for libel and for unfair and deceptive trade practices. ............................................. 51

CONCLUSION ................................................................................. 54

REQUEST FOR ORAL ARGUMENT ................................................. 54

CERTIFICATE OF COMPLIANCE ..................................................... 56

<u>T</u>ABLE OF <u>A</u>UTHORITIES

## <u>Cases</u>

*Arnold v. Sharpe*,
  296 N.C. 533 (1979) .........................................................................26

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).........................................................................21

*Becker v. Graber Builders, Inc.*,
  149 N.C. App. 787 .................................................................... 45, 46

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)............................................................. 21, 22, 52

*Biospherics, Inc. v. Forbes, Inc.*,
  151 F.3d 180 (4th Cir. 1998) ............................................... 36, 52, 53

*Boyce & Isley, PLLC v. Cooper*,
  153 N.C. App. 25 (2002) ...................................................... 23, 45, 53

*Boyle v. Dwyer*,
  172 N.H. 548 (2019) .........................................................................24

*Celle v. Filipino Reptr. Enters. Inc.*,
  209 F.3d 163 (2d Cir. 2000)............................................................25

*Daniels v. Metro Mag. Holding Co.*,
  179 N.C. App. 533 (2006) ................................................................29

*Davis v. Boeheim*,
  24 N.Y.3d 262 (2014) ............................................................ 25, 32, 41

*Desmond v. News & Observer Pub. Co.*,
  241 N.C. App. 10 (2015)...................................................................31
  375 N.C. 21 (2020) ................................................................. *passim*

*E.E.O.C. v. Seafarers Int'l Union*,
  394 F.3d 197 (4th Cir. 2005) ...........................................................21

*Ellis v. North Star Co.*,
  326 N.C. 219 (1990) .........................................................................45

*Hall v. Virginia*,
 385 F.3d 421 (4th Cir. 2004) ...............................................................47

*Hongda Chem USA, LLC v. Shangyu Sunfit Chem. Co.*, Ltd.,
 No. 1:12-CV-1146, 2020 WL 1150214 (M.D.N.C. Mar. 10, 2020) ..................49

*Johnson v. Oroweat Foods Co.*,
 785 F.2d 503 (4th Cir. 1986) ...............................................................21

*Kaelin v. Globe Communications Corp.*,
 162 F.3d 1036 (9th Cir. 1998) ...................................................... 40, 42

*King v. Glove Newspaper Co.*,
 400 Mass. 705 (1987) .................................................................. 25, 41

*Koolvent Aluminum Prod., Inc. v. Azrael, Gann & Franz*,
 52 F.3d 321, 1995 WL 227351 (4th Cir. 1995) ....................................24

*Laber v. Harvey*,
 438 F.3d 404 (4th Cir. 2006) ...............................................................21

*Las Vegas Sun, Inc. v. Franklin*,
 74 Nev. 282 (1958) ...................................................................... 40, 42

*Lomax v. Ortiz-Marquez*,
 140 S. Ct. 1721 (2020) ......................................................................22

*Marshall v. Miller*,
 302 N.C. 539 (1981) .........................................................................46

*Matrix Capital Mgm't Fund, LP v. BearingPoint, Inc.*,
 576 F.3d 172 (4th Cir. 2009) ...............................................................20

*Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*,
 674 F.3d 369 (4th Cir. 2012) ...............................................................20

*McLean v. United States*,
 566 F.3d 391 (4th Cir. 2009) ...............................................................22

*Milkovich v. Lorain J. Co.*,
 497 U.S. 1 (1990)................................................................... *passim*

*Mylan Laboratories, Inc. v. Matkari*,
   7 F.3d 1130 (4th Cir. 1993) ...............................................................22

*New Times, Inc. v. Isaacks*,
   146 S.W.3d 144 (Tex. 2004).............................................................40

*Nguyen v. Taylor*,
   219 N.C. App. 1 (2012) ....................................................................26

*Ollman v. Evans*,
   750 F.2d 970 (D.C. Cir. 1984)..........................................................32

*Ostrzenski v. Seigel*,
   177 F.3d 245 (4th Cir. 1999) ...................................................... 20, 51

*Pinehurst, Inc. v. O'Leary Bros. Realty*,
   79 N.C. App. 51 (1986) .......................................................... 49, 50, 54

*Porter v. Bd. of Trustees of N. Carolina State Univ.*,
   72 F.4th 573 (4th Cir. 2023) .............................................................19

*Renwick v. News & Observer Pub. Co.*,
   63 N.C. App. 200 (1983)........................................................ 23, 24, 29
   310 N.C. 312 (1984) .........................................................................24

*S. Atl. Ltd. P'ship of Tennessee, L.P. v. Riese*,
   284 F.3d 518 (4th Cir. 2002) ............................................................47

*Scheuer v. Rhodes*,
   416 U.S. 232 (1974)...........................................................................22

*Stanton v. Metro Corp.*,
   438 F.3d 119 (5th Cir. 2006) ................................................ 24, 39, 40

*Stegemann v. Gannett Co., Inc.*,
   970 F.3d 465 (4th Cir. 2020) ............................................................20

*Swengler v. ITT Corp. Electro-Optical Prod. Div.*,
   993 F.2d 1063 (4th Cir. 1993) ............................................. 26, 28, 29

*Talbert v. Mauney*,
   80 N.C. App. 477 (1986) ...................................................................50

*United States v. Garcia*,
   855 F.3d 615 (4th Cir. 2017) ..................................................................48

*Walker v. Sloan*,
   137 N.C. App. 387 (2000) .....................................................................48

## **Statutes**

28 U.S.C. § 1291 .........................................................................................1

28 U.S.C. § 1332 .........................................................................................1

## **Rules**

Federal Rule of Evidence 201 ....................................................................47

Federal Rule of Civil Procedure 12(b)(2) ...................................................2

Federal Rule of Civil Procedure 12(b)(6) .................................................2, 3

Federal Rule of Civil Procedure 59 ......................................................1, 3, 4

## **Other Authorities**

Robert D. Sack, SACK ON DEFAMATION (5th ed. 2021) ...................................24, 40

Charles Allen Wright & Arthur R. Miller,
   FEDERAL PRACTICE AND PROCEDURE (2d ed. 1990)..........................................51

Restatement (Second) of Torts..........................................................24, 30, 39, 40

**JURISDICTIONAL STATEMENT**

The United States District Court for the Middle District of North Carolina had jurisdiction over this action under 28 U.S.C. § 1332. On December 12, 2023, the court dismissed with prejudice all claims against Defendant Dun & Bradstreet, Inc. for failure to state a claim on which relief may be granted. (JA118). On March 18, 2024, the court denied Plaintiffs' request that the court alter or amend its judgment and allow leave to file an amended complaint. (JA336). This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291 because it is from a final decision disposing of all parties' claims. Plaintiffs timely filed their Notice of Appeal on April 15, 2024. (JA344).

**STATEMENT OF ISSUES**

1.    Whether the district court erred in denying Plaintiffs' motion under Federal Rule of Civil Procedure 59 to alter or amend the judgment to allow leave to file an amended complaint on the basis that the proposed amended claims were futile?

> a. Whether the district court erred in holding that, even reading the challenged publications as a whole and taking all the factual allegations as true, the statements identified as false and defamatory in the proposed amended complaint were either true or were statements of opinion?

1

b. Whether the district court erred in holding that, taking all the factual allegations as true, Plaintiffs failed to allege an "actual injury" in support of their proposed amended claim for violation of the North Carolina Unfair and Deceptive Practices Act?

2. Whether the district court erred by dismissing with prejudice Plaintiffs' initial complaint under Federal Rule of Civil Procedure 12(b)(6) rather than allowing Plaintiffs an opportunity to file an amended complaint?

<u>STATEMENT OF THE CASE</u>[1]

**I. D&B markets its credit reporting business as accurate, reliable, and based on factual information.**

Defendant Dun & Bradstreet, Inc. ("D&B")—by far the most prominent reporter on business credit—creates and maintains business credit reports ("Credit Reports") for numerous public and private companies and publishes the Credit Reports to businesses, financial institutions, governmental entities, and the general public. (JA142). This case arises from D&B's false Credit Reports regarding Plaintiffs-Appellants RE Carroll Management Company, CIP Construction Company, Carroll Industrial Development US, LLC, Alaris Homes, Inc., Snap

---

[1] Because this appeal focuses primarily on the district court's order on Plaintiffs' Rule 59 motion, this section cites the facts alleged in the Proposed Amended Complaint.

Publications, LLC, and Carroll Investment Properties, Inc. (collectively, the "Carroll Companies").

D&B markets itself as a thorough and scrupulously accurate reporter, emphasizing that its Credit Reports are based on robust, heavily researched, and continuously updated data. (JA142-143). Indeed, D&B promotes the Credit Reports as being so factually accurate that they can and should be relied on, without further analysis, when deciding whether to do business with the subject company. (JA142-143). And that characterization is generally accepted, as some parties—including the federal government—will not do business with a company that has not been assigned a unique "D-U-N-S Number" by D&B. (JA142).

In its own materials, D&B describes its Credit Reports as "verified"; subject to "strict data-governance policies"; "comprehensive"; "curated from tens of thousands of sources"; including "200 million unique trade experiences, shining a light on companies' ability to pay"; "continuously updated . . . in the most relevant manner"; "best-in-class"; "world-renowned"; "common, trusted, and continuously updated view[s] of customers, prospects, suppliers, and partners"; and capable of fostering "quick, highly-insightful credit decisions based on quality data and insights." (JA143). D&B publicly represents that its Credit Reports can fulfill a company's due diligence obligations when deciding who to do business with:

3

"Keeping track of this constant change takes diligence. We undertake the responsibility, so you don't have to." (JA143).

In making these and other representations, D&B focuses on three key themes: (1) D&B's Credit Reports are accurate, reliable, and continuously updated; (2) lenders and potential business partners can rely on the Credit Reports to make decisions regarding whether to make a loan or do business with a company, including by using the reports to "automate" decisions; and (3) a poor Credit Report can and will result in unfavorable credit terms, lost business opportunities, and outright refusals to deal. (JA145-146).

## II.     The structure and organization of the Credit Reports imply reliance on underlying facts and data.

All Credit Reports share a similar structure and organization. For example, the first section of the Credit Report for Plaintiff CIP Construction Company ("CIP") is a "Summary," which includes brief overviews of what D&B calls "overall business risks," "viability ratings," "failure scores," "delinquency scores," and "maximum credit recommendations" (collectively, "Risk Summaries"). (JA187). As part of this section, D&B sets forth the factual information on which the Risk Summaries are supposedly based, including pending lawsuits, Uniform Commercial Code filings, unsatisfied judgments, and overdue trade payments. (JA188).

The next section of the Credit Report provides further in-depth analysis of the issues raised in the Risk Summaries. First is D&B's "Risk Assessment," which is a

series of charts and "scores" on various criteria. (JA189-192). For example, under "Delinquency Score"—which was a 9 (high risk) for CIP—D&B notes "[e]vidence of negative trade," "[r]ecent amount past due," and "[p]roportion of slow payment experiences to total number of payment experiences reported." (JA190).

The next section is "Trade Payments," which claims to be "[b]ased on 24 months of data." (JA192). D&B's analysis in this section is supported by two graphs that break down CIP's "Payment Experiences," listing the percentage of CIP's payments due that were supposedly paid late, among other data. (JA192-195).

Next is the "Legal Events" section, in which D&B makes factual representations regarding the "Filing Date," "Status," "Date Status Attained," "Received Date," and "Amount" of legal filings and judgments. (JA195-197). The only qualification D&B makes regarding the accuracy of this information—which, again, D&B claims is "continuously updated"—is that "[t]he public record items contained in this report may have been paid, terminated, vacated or released prior to the date this report was printed." (JA197). This qualification is made nine pages after the Legal Events summary, where D&B first introduces the data. (JA188, JA197).

D&B presents the Credit Reports as being based on extensive facts. For example, CIP's Credit Report is filled with purported facts:

- Age of business: 12 years (2010 Year Started)

- Employees: 46 (3 here)

- Probability of delinquency over the next 12 months: 15.79%

- Probability of becoming no longer viable: 11.00%

- Last filed suit: 09-18-2019

- Last filed "UCC": 10-30-2017

- Total trade experiences: 29

- Highest now owing (Trade Payment): $2,500

- Largest high credit (Trade Payment): $300,000

- Average high credit: $16,078

- Overall payment behavior: 2 Days Beyond Terms

- Trade within terms: 70%

- Total trade payments placed in collection: 1

- Trade payments by credit extended (based on 12 months of "data"): 21 experiences

- Trade payments by industry (based on 24 months of "data"): 42 experiences

- Suits: 3 (Latest Filing: 09-18-2019), with status and amount

- UCC Filings: 4 (Latest Filing: 10-30-2017), with collateral

(JA186-195).

D&B surrounds these facts with implications of additional supporting data. For example, CIP's Credit Report includes a "D&B Viability Rating," which is reported on a scale of 1 (low risk) to 9 (high risk). (JA189). D&B asserts that CIP

had a viability rating of 8, meaning it had a high risk of failing. (JA189). Immediately below that rating, D&B states its "Rating Confidence Level," meaning how confident D&B is in the viability rating. (JA189). For CIP, D&B asserted its highest level of confidence ("Robust Predictions"). (JA189). Finally, D&B reports on the "data depth" underlying the viability rating. (JA189). In the case of CIP, the data supposedly comes from "Rich Firmographics," "Extensive Commercial Trading Activity," and "Basic Financial Attributes." (JA189).

### III.    D&B creates false Credit Reports regarding the Carroll Companies.

D&B created Credit Reports for each of the Carroll Companies. (JA150). These reports have been and continue to be published by D&B throughout the United States and the rest of the world. (JA164). As of June 2022, the Credit Reports for the Carroll Companies falsely described each company as a poor credit risk due to purportedly factual information, including poor payment history, outstanding judgments and liens, and other vaguely referenced circumstances supposedly known to D&B but not specified in the Credit Report. (JA151). In general, D&B's Credit Reports represent that each of the Carroll Companies is financially unstable and likely to default on its obligations to lenders and business partners. (JA152).

*That is false*. In fact, each and every one of the Carroll Companies is an established company with solid financial standing and a strong credit history that promptly satisfies its contractual obligations. (JA165). Moreover, despite portraying

its Credit Reports as being based on "comprehensive" data that is "verified" according to "strict data governance policies," D&B's Credit Reports scored and rated the Carroll Companies based on lack of information or on information that D&B knew or should have known was false. (JA165-166). Specifically, among other issues, D&B's Credit Reports include false facts regarding (1) pending lawsuits, (2) UCC filings, and (3) outstanding judgments.

*First*, D&B's Credit Reports on CIP and RE Carroll Management Company ("RE Carroll") falsely state that eight lawsuits are "pending," when each of those lawsuits had already been resolved well before the time of publication. (JA153, JA156-157).

For example, D&B identifies three "pending" lawsuits as support for CIP's negative Risk Assessment, portraying each as a liability exposure for CIP:

- The *U.S. Framing* action—shown by D&B as "pending" with liability exposure of at least $316,836—was resolved on February 9, 2021 (16 months prior to the date of the CIP Report). (JA154, JA195).

- The *Lithko Contracting* action—shown by D&B as "pending" with a liability exposure of at least $178,937—was resolved on September 11, 2019 (more than two-and-a-half years prior to the date of the CIP Report). (JA154, JA195).

8

- The *84 Lumber* action—shown by D&B as "pending" with an unspecified liability exposure—was resolved through arbitration on June 21, 2017 (*five years* prior to the date of the CIP Report). (JA153-154, JA196).

D&B's Risk Assessment of RE Carroll includes similar falsehoods, describing as "pending" lawsuits that had long since been resolved:

- The *Washington* action—shown as "pending" with a liability exposure of at least $10,000—was resolved December 14, 2020 (more than one-and-a-half years prior to the date of the RE Carroll Report). (JA157, JA210).

- The *Carolina Cleaning Co.* action—shown as "pending" with an unspecified liability exposure—was dismissed October 1, 2021 (i.e., over eight months prior to the date of the RE Carroll Report). (JA157, JA210).

- The *Jenkins* action—shown as "pending" with a liability exposure of at least $649—was resolved on November 5, 2014 (i.e., over seven-and-a-half years prior to the date of the RE Carroll Report). (JA157-158, JA210-211).

- The *Complete Lawn Grounds* action—shown as "pending" with a liability exposure of at least $1,875—was resolved on June 20, 2014 (i.e., *eight years prior* to the date of the RE Carroll Report). (JA158, JA211).

9

- The *Smith* action—shown as "pending" with an unspecified liability exposure—was resolved May 23, 2022 (one month before the RE Carroll Report). (JA157, JA210).

Thus, D&B's representations that these lawsuits are "pending," along with the Risk Assessments based on such claims, were not only false at the time the representations were made, but in most cases were verifiably false based on information that had been publicly available for months or years.

*Second*, D&B's Credit Reports falsely state that there are three UCC filings evidencing liens against CIP. The CIP Report lists the debtor on each filing as Ascot Point Village Apartments, LLC. (JA196-197). However, Ascot Point is a separate and distinct entity from CIP. (JA155). Nothing in the CIP Report explains any connection between CIP and Ascot Point, but the inclusion of these UCC filings in CIP's report at least implicitly represents that those lien filings are imputable to CIP.

*Third*, D&B falsely asserts that there is an "unsatisfied" judgment against RE Carroll in the matter of *Becerra v. RE Carroll* (JA209; "Becerra Judgment"), but the Becerra Judgment was satisfied on January 25, 2017 (i.e., over five years prior to the date of the RE Carroll Credit Report). (JA156-157).

In sum, the Credit Reports for the Carroll Companies include numerous factual representations that are verifiably false. Moreover, those reports claim to be based on other information that is *not disclosed* in the Credit Reports, such as

supposedly factual information regarding payment history. D&B knows that this purported information about payment history—which, as addressed below, it refused to provide to the Carroll Companies unless the Carroll Companies bought D&B's products—is incomplete at best, and therefore it knows that its Credit Reports grossly misrepresent the Carroll Companies' payment history. (JA151-152). For that and other reasons, D&B's representations about the Carroll Companies' stability and creditworthiness are arbitrary and not supported by any factual information. (JA151). As a result, D&B falsely portrays the Carroll Companies as financially unstable and likely to default on their obligations. (JA152).

IV.    **D&B's leverages the false, negative Credit Reports to coerce the Carroll Companies into *quid pro quo* arrangements to "repair" their ratings.**

As the Carroll Companies have learned, D&B makes it difficult and expensive to challenge inaccuracies in its Credit Reports. (JA146). Initially, a company that wishes to know what is in its D&B Credit Report must pay for the privilege. (JA146). If a company wishes to view all of its scores, and receive an explanation of them, its only choice is to purchase D&B's CreditMonitor service. (JA146).

If a company believes its report is inaccurate, D&B gives companies two options, both of which provide more benefit to D&B than the affected company. First, an affected company can give D&B proprietary and confidential financial statements and grant D&B a "non-exclusive, royalty-free, perpetual, and worldwide

license to use" the information however it sees fit. (JA146-147). Second, an affected company can pay D&B for the opportunity to "potentially" improve its scores. (JA147).

The Carroll Companies contacted D&B many times to notify D&B that the information in the Credit Reports was incorrect, demanding that D&B end all reporting on the Carroll Companies' finances and creditworthiness and stop making unsupported claims about the Carroll Companies' viability. (JA166). Even with knowledge that its representations are false, D&B continues to make false and negative claims about the supposed high risk of working with the Carroll Companies. (JA166).

Rather than correcting this misinformation, D&B attempted to coerce the Carroll Companies into purchasing D&B's subscription-based "CreditBuilder" products and granting D&B broad rights to use the Carroll Companies' confidential and proprietary information. (JA167). For example, one D&B employee suggested in an email to the Carroll Companies that they could improve their credit ratings by purchasing such a subscription (hereinafter, the "D&B Email"). (JA167, JA263). That email follows the D&B playbook of using negative scores and ratings to gin up business in the form of paid, automatically renewing subscriptions that supposedly will improve those same scores and ratings. (JA167). Specifically, the D&B Email:

- Cautions that "[y]our business affiliates typically use your [D&B] scores, ratings, and business information as part of their decision-making process";

- Emphasizes the importance of ensuring that the D&B Credit Report "shows your company in the best possible light"; and

- States that the best way to "make sure that your file is reflective of the business" is through the "Credit Builder premium, plus and the Concierge solution" which will enable the company "to start getting your file out of the Incomplete status."

(JA167). As an additional inducement, the D&B Email provides links to "[j]ust a few of the many cases where a D&B Credit Report has worked *for* a company instead of *against."* (JA168 (emphasis added)).

The D&B Email laid bare D&B's deceptive *modus operandi*—akin to a fictional mobster demanding protection money and telling a business owner, "I'd hate to see something bad happen to your building." Those same tactics were identified by the Federal Trade Commission in a complaint for unfair trade practices against D&B (the "FTC Complaint"). (JA168, JA269-285). The FTC Complaint alleged that:

- D&B's Credit Reports frequently reflect inaccurate and incomplete information "about an affected business's payment experiences with other entities and overall financial health."

- Because D&B refuses to provide information regarding its sources, businesses must deal directly with D&B to correct inaccuracies and errors, and often are unable to do so.

- Businesses suffer "negative consequences as a result of inaccurate and incomplete information appearing on" their D&B Credit Report.

- D&B "routinely deceptively claimed"—as it did with the Carroll Companies—"that purchasing a CreditBuilder line product is the path by which an affected business can add payment history and improve its scores and ratings."

- Although D&B represents that it is easy for a company to add payment experiences to improve its scores, in reality D&B routinely rejects such submissions and will not explain why a submission was rejected or help a company make a successful submission.

(JA168, JA269-285).

Shortly after the Carroll Companies filed this action on June 16, 2023, the negative scores and ratings in the 2022 Carroll Companies' Credit Reports suddenly improved, seemingly without any material change to the underlying factual

information. (JA169). In other words, it was only after the Carroll Companies refused to be coerced into buying D&B's products, and instead invested substantial time and money into bringing this lawsuit, that D&B attempted to correct some of the information it knew was false. (JA171).

**V.    The district court dismisses the Carroll Companies' initial complaint with prejudice and denies them an opportunity to amend.**

On June 16, 2023, the Carroll Companies commenced this action against Defendants Dun & Bradstreet Holdings, Inc., The Dun & Bradstreet Corporation, and Dun & Bradstreet, Inc. On September 18, 2023, Defendants moved to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2) and failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) (JA5, JA114).

On December 1, 2023, the district court dismissed the claims against Defendants Dun & Bradstreet Holdings, Inc. and Dun & Bradstreet Corporation for lack of personal jurisdiction. (JA7). The Carroll Companies have not appealed from that order. Then on December 12, 2023, the court dismissed with prejudice all claims against D&B for failure to state a claim on which relief may be granted. (JA118). The judgment was entered on December 13, 2023. (JA129).

On January 9, 2024, the Carroll Companies filed a motion under Federal Rule of Civil Procedure 59 to alter or amend the judgment and for reconsideration of the Rule 12(b)(6) order. (JA130). Specifically, the Carroll Companies requested that the

15

court vacate the judgment and grant leave to file an amended complaint as to their claims against D&B for libel *per se* and violation of the North Carolina Unfair and Deceptive Trade Practices Act. (JA131). The Carroll Companies submitted a proposed amended complaint in connection with that motion. (JA136).

On March 18, 2024, the district court denied Plaintiffs' motion to alter or amend its judgment and to allow leave to file an amended complaint on the sole basis that the proposed amended complaint was futile. (JA336). The court first reasoned that, with respect to "pending" lawsuits, "the complaint and the appended statements made by Dun & Bradstreet show that the reports do not claim that the lawsuits are 'pending' as of the dates of publication," relying on D&B's limited disclaimer that information may have changed between collection of the information and publication of the report. (JA338). Similarly, the court found that false statements about unsatisfied judgments were not actionable because of the same disclaimer. (JA338). As for the UCC filings, the court held that D&B's inclusion of filings against "Ascot Point Village Apartments, LLC" on CIP's Credit Report could not support a valid claim because D&B identified the debtor on the filings and the Carroll Companies' challenge to "Dun & Bradstreet's evaluation process in forming its opinions that these liens are linked to a plaintiff" was misdirected. (JA339).

As to the Carroll Companies' argument that the Credit Reports imply defamatory facts, the court reasoned that "[t]he Carroll Companies have not alleged

sufficient facts to draw a plausible inference that the Dun & Bradstreet reports contain or imply 'false, defamatory statements.'" (JA340).

The district court also held that the Fifth and Sixth Claims for Relief—brought under the North Carolina Unfair and Deceptive Trade Practices Act—were futile. (JA340-342). The court held that the Fifth Claim was futile for the same reasons the defamation claims were futile. (JA341). As for the Sixth Claim, the court held that the Carroll Companies did not "allege facts sufficient to support an inference that the alleged UDTPA violation 'proximately caused injury' to them." (JA342).

The Carroll Companies timely filed their Notice of Appeal on April 15, 2024, as to (1) the Order entered on December 12, 2023 (JA118) granting Defendant-Appellee D&B's Motion to Dismiss; (2) the Judgment entered on December 13, 2023 (JA129); and (3) the Order entered on March 18, 2024 (JA336) denying the Carroll Companies' Motion to Alter or Amend the Judgment. (JA344).

## SUMMARY OF ARGUMENT

D&B's business is built on marketing the value of its Credit Reports to lenders, potential business partners, and others who seek in-depth, continuously updated data and analysis—*facts*—about businesses large and small. Its Credit Reports are more than a dozen pages long; they include a variety of "scores" in various categories, including viability, delinquency, likelihood of failure, and overall risk.

17

D&B supports these "scores" in two ways. First, it makes various factual representations regarding "pending" lawsuits, outstanding judgments, past due trade payments, and UCC filings. These are the asserted facts. Second, D&B makes clear that it possesses a wealth of underlying data not detailed in the Credit Reports that supports the ultimate "scores" it assigns to each factor. These are the implied facts.

In this case, D&B got the *asserted facts* flat wrong. D&B claimed the Carroll Companies had eight pending lawsuits; in fact, none were pending. D&B claimed the Carroll Companies had an outstanding judgment; in fact, the judgment at issue had been satisfied five years earlier. D&B claimed that one of the Carroll Companies was encumbered by several liens; in fact, the liens at issue relate to an entirely different entity.

The district court interpreted inconspicuous, vaguely worded disclaimers and labels in the Credit Reports as preventing these false statements from being actionable. In so doing, the district court improperly viewed the Credit Reports in the light most favorable to D&B. Both in their language and in their placement, the disclaimers and labels fail to make D&B's false assertions any more truthful.

D&B also defamed the Carroll Companies by implying the existence of additional facts underlying its negative "scores." Not only were these implied facts untrue; the very representation that D&B possessed such facts was untrue. Instead,

18

as the Carroll Companies have plausibly alleged, D&B had *no* real data or facts about the Carroll Companies. It was all a façade.

When confronted by the Carroll Companies about its defamatory Credit Reports, D&B gave away its game. Instead of correcting its errors, D&B offered the Carroll Company two options—give D&B all of the (private) Carroll Companies' financial data at no cost, or pay for D&B's services in hopes that D&B would help fix the problem D&B's own actions had caused. Even setting aside the plainly defamatory Credit Reports, D&B's "protection" scheme is quintessentially unfair, deceptive, and contrary to North Carolina law.

The district court missed the mark when it first dismissed Plaintiffs' complaint with prejudice, and then denied them an opportunity to correct the deficiencies identified in the initial dismissal order. Plaintiffs' Proposed Amended Complaint was far from futile. Taking the factual allegations as true and drawing all the inferences in favor of Plaintiffs, the district court should have allowed Plaintiffs' Rule 59 motion. This Court should reverse.

<u>**ARGUMENT**</u>

## I.    The standard of review on appeal is *de novo*.

This Court reviews *de novo* a dismissal under Rule 12(b)(6). *Porter v. Bd. of Trustees of N. Carolina State Univ.*, 72 F.4th 573, 581 (4th Cir. 2023).

When a complaint is dismissed under Rule 12(b)(6), the district court normally should dismiss without prejudice and allow an opportunity to amend the complaint. *Ostrzenski v. Seigel*, 177 F.3d 245, 253 (4th Cir. 1999). When judgment has been entered, and the case is dismissed with prejudice, a motion to alter or amend under Rule 59(e) is the appropriate means of obtaining leave to amend because a Rule 15(a) motion may not be granted unless the judgment is vacated. *Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 674 F.3d 369, 378 (4th Cir. 2012).

A conclusion that the district court erred in denying leave to amend is sufficient to reverse the court's denial of a Rule 59(e) motion. *See id.* (quoting *Matrix Capital Mgm't Fund, LP v. BearingPoint, Inc.,* 576 F.3d 172, 192 (4th Cir. 2009)). Therefore, a Rule 59(e) motion is evaluated as a Rule 15(a) motion. *Id.* at 378-79 ("Rule 15(a) and Rule 59(e) motions rise and fall together.")

Where, as here, the district court denies a motion to amend on futility grounds, the Court reviews the decision *de novo*. *See Stegemann v. Gannett Co., Inc.*, 970 F.3d 465, 473 (4th Cir. 2020) (reviewing *de novo* a denial of a motion to amend on the grounds of futility).

**II.    The Proposed Amended Complaint was not futile because the Carroll Companies sufficiently alleged that D&B's Credit Reports include and imply actionable false assertions of fact.**

The district court first erred by incorrectly holding that the Carroll Companies' First Claim for Relief in the Proposed Amended Complaint, for libel *per se*, was futile because the allegations did not establish actionable defamation.

### A. The district court misapplied the "plausibility" standard.

A post-judgment motion to amend is evaluated under the same standard as a pre-judgment motion—i.e., the amendment should only be denied if it "would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would have been futile." *Laber v. Harvey*, 438 F.3d 404, 426 (4th Cir. 2006). "Leave to amend . . . should only be denied on the ground of futility when the proposed amendment is clearly insufficient or frivolous on its face." *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 510 (4th Cir. 1986).

To suffice at the pleadings stage, the proposed amended complaint (like any complaint) must only contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Stegemann*, 970 F.3d at 473 (cleaned up); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In its review, the court must "construe the evidence in the light most favorable to the non-movant." *E.E.O.C. v. Seafarers Int'l Union*, 394 F.3d 197, 200 (4th Cir. 2005). The court "should accept as true all well-pleaded

21

allegations and should view the complaint in a light most favorable to the plaintiff." *Mylan Lab'ys, Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993).

Here, the Carroll Companies' allegations need only "raise a right to relief above the speculative level," thereby "nudg[ing] [their] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 555, 570. The district court is not permitted to substitute its own judgment about the truth or likelihood of the truth of well-pled facts, and is not, through the plausibility standard, allowed to discount factual allegations. *See McLean v. United States*, 566 F.3d 391, 399 (4th Cir. 2009) ("Although the Supreme Court has subsequently made clear that the factual allegations in a complaint must make entitlement to relief plausible and not merely possible, what Rule 12(b)(6) does not countenance are dismissals based on a judge's disbelief of a complaint's factual allegations." (cleaned up)), *abrogated on other grounds*, *Lomax v. Ortiz-Marquez*, 140 S. Ct. 1721, 1727 (2020). Indeed, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable and 'that a recovery is very remote and unlikely.'" *Twombly*, 550 U.S. at 556 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

Rather than following these long-established standards, the district court viewed the alleged facts in the light most favorable to *Defendant* in multiple respects, thereby substituting its own judgment as to the ultimate merits of the Proposed Amended Complaint. As one example of the district court looking beyond the well-

pleaded factual allegations of the Proposed Amended Complaint and inappropriately drawing inferences against the Carroll Companies to determine truth or falsity, the court cited and relied on the Affidavit of Ashley I. Kissinger. (JA339). In that affidavit, counsel for D&B (1) describes attempts by her "office" to gather certain UCC filings from the North Carolina Secretary of State, (2) references inadmissible hearsay from an unnamed employee in the Secretary of State's office, and (3) attaches unauthenticated copies of documents she says were emailed to her "office" by that unnamed employee. (JA318-319).

That sort of fact-finding has no place in the context of a Rule 12(b)(6) motion. And as discussed below, it is far from the only instance in which the district court failed to sufficiently credit the Carroll Companies' allegations and the reasonable inferences to be drawn from them.

### B. An ordinary reader would understand the Credit Reports to be defamatory *per se*.

"[I]n order to recover for defamation, a plaintiff generally must show that the defendant caused injury to the plaintiff by making false, defamatory statements of or concerning the plaintiff, which were published to a third person." *Desmond v. News & Observer Pub. Co.*, 375 N.C. 21, 41 (2020) (citation omitted). When examining an allegedly defamatory statement, the court views the entire statement in its full context and interprets it as ordinary people would understand it. *Boyce & Isley, PLLC v. Cooper*, 153 N.C. App. 25, 31 (2002); *see also Renwick v. News &*

*Observer Pub. Co.*, 63 N.C. App. 200, 210 (1983) ("All the parts of the publication must be considered in order to ascertain the true meaning, and words are not to be given a meaning other than that which the context would show them to have."), *rev'd on other grounds*, 310 N.C. 312 (1984); Robert D. Sack, SACK ON DEFAMATION § 2:4.2 (5th ed. 2021) ("Particular words must be read in the context of the communication as a whole, taking into account the communication's wording, the nature and use of headlines, and any other methods employed to give special emphasis." (cleaned up)).

A statement is defamatory if it discredits the plaintiff in the minds of any significant number of laypersons in the community. *See* SACK ON DEFAMATION § 2:4.3; Restatement (Second) of Torts § 559 ("It is enough that the communication would tend to prejudice [the plaintiff] in the eyes of a substantial and respectable minority of [the community]."); *Stanton v. Metro Corp*, 438 F.3d 119, 127 (5th Cir. 2006) (stating that "it is not dispositive that a numerical majority of its audience would arrive at a non-defamatory interpretation"); *Boyle v. Dwyer*, 172 N.H. 548, 554 (2019) (reasoning that the statement must "lower the plaintiff in the esteem of any substantial and respectable group, even though it may be quite a small minority").

In determining whether a statement is defamatory, the court must read the words as a reasonable reader would, not as a judge or lawyer would. *See Koolvent*

*Aluminum Prod., Inc. v. Azrael, Gann & Franz*, 52 F.3d 321, 1995 WL 227351, at

*3 (4th Cir. 1995) (unpublished) (reasoning "the district court erred by reading the

letter too technically"); *Celle v. Filipino Reptr. Enters. Inc.,* 209 F.3d 163, 177 (2d

Cir. 2000) ("[T]he words are to be construed not with the close precision expected

from lawyers and judges but as they would be read and understood by the public to

which they are addressed." (cleaned up)).

Critically, on a motion to dismiss, the plaintiff is permitted to proceed if the

statement is reasonably susceptible of a defamatory connotation—even if there is

also a reasonable interpretation that is not defamatory. *Davis v. Boeheim*, 24 N.Y.3d

262, 272 (2014); *see King v. Glove Newspaper Co*., 400 Mass. 705, 717-18 (1987)

("Words may be [libelous] unless they cannot be reasonably understood in a

defamatory sense, or, to express it in another way, unless they are incapable of a

defamatory meaning." (cleaned up)).

In North Carolina, the elements of libel—such as falsity and defamatory

import—cannot be analyzed in isolation; rather, when reading the full statement and

considering its context, the issue is whether the statement (and its underlying

assertions and implications) includes false and defamatory components. *See

Desmond*, 375 N.C. at 67.

Here, the Carroll Companies allege that D&B's false Credit Reports are

defamatory *per se*. When statements are defamatory *per se*, "the mere saying or

writing of the words is presumed to cause injury to the subject; there is no need to prove any actual injury." *Nguyen v. Taylor*, 219 N.C. App. 1, 8 (2012) (citation omitted). Statements that are defamatory *per se* include those that tend to impeach a person in that person's trade or profession. *Arnold v. Sharpe*, 296 N.C. 533, 537 (1979); *see also Swengler v. ITT Corp. Electro-Optical Prod. Div.*, 993 F.2d 1063, 1071 (4th Cir. 1993) ("[A] corporation may be defamed *per se* by statements which cast aspersion on its honesty, credit, efficiency or its prestige or standing in its field of business." (cleaned up)).

D&B has not argued (and the district court did not hold) that the statements about which the Carroll Companies complain were not published to a third party and were not "of and concerning" the Carroll Companies. Moreover, there is no dispute (and the district court did not question) that the false Credit Reports impeach the Carroll Companies' businesses and cast "aspersions" on their standing in the community. Instead, D&B's argument (and the district court's rulings) as to whether the statements are actionable focused on two issues: (1) whether certain of D&B's statements were false; and (2) whether certain of D&B's statements were "opinions" protected by the First Amendment. Each is addressed in turn.

### C. The Credit Reports include false factual assertions regarding outstanding lawsuits, judgments, and liens.

First, the Credit Reports are defamatory because they assert facts that are verifiably false, making such statements actionable as libel.

The Credit Reports are filled with assertions of fact that D&B claims support the overall assessment of the Carroll Companies as financially unstable and likely to default on their obligations. For example, D&B asserts that CIP has three "pending" lawsuits against it with a combined liability exposure of at least $495,773. (JA154). However, CIP had resolved these actions well before the Credit Report was released. (JA154). One "pending" lawsuit was in fact resolved *five years* prior to the date of the CIP Credit Report. (JA154).

Similarly, RE Carroll's Credit Report includes five "pending" lawsuits, all of which had been resolved prior to the Credit Report's release. (JA157-158). One such action was resolved *eight years* prior to the date of the RE Carroll Credit Report. (JA158). D&B also claims that the Becerra Judgment against RE Carroll is "unsatisfied," when it was actually satisfied over five years before the date of the RE Carroll Credit Report. (JA157). These claims are objectively false.

Finally, D&B falsely attributes liabilities to CIP, asserting in CIP's Credit Reports that there are three UCC filings evidencing liens against it when those liens in fact identify Ascot Point Village Apartments, LLC as the debtor. (JA154). The district court found that these statements were not defamatory because they identified the debtor as an entity other than CIP and because there was no basis to challenge the conclusion that Ascot Point and CIP were somehow linked. (JA339). In so ruling, though, the district court failed to properly draw inferences in the

27

Carroll Companies' favor. Specifically, the Court ignored that by listing these filings in CIP's Credit Report, D&B falsely implied that CIP is responsible for the underlying liens and that D&B has information that warrants such a conclusion. The Carroll Companies alleged that both implications are false. (JA154).

The claims about pending lawsuits, liens, and judgments are all false, defamatory statements concerning the plaintiff, which were published to a third person, and are thus actionable as libel. Moreover, the statements are defamatory *per se* because each statement "casts aspersions on [the Carroll Companies'] credit, efficiency or its prestige or standing in the field of business." *Swengler*, 993 F.2d at 1071. The allegations regarding these statements alone are therefore sufficient to find that the district court erred in determining that the Carroll Companies' proposed amendment to their libel claim was futile.

## D. The district court misapprehended the constitutional line between fact and opinion.

Second, the district court incorrectly concluded that the Proposed Amended Complaint was futile when it held that certain false statements in the Credit Reports were opinions and that the Carroll Companies had not sufficiently alleged that "the Dun & Bradstreet reports contain or imply 'false, defamatory statements.'" (JA340). In so ruling, the district court misapplied the applicable legal principles governing the difference between facts and opinions and misunderstood the circumstances in which opinions may still be defamatory.

28

There is no bright-line distinction between fact and opinion; instead, "what constitutes a statement of fact in one context may be treated as opinion in another in light of the nature and context of the communication taken as a whole." *Renwick*, 63 N.C. App. at 218 (citation omitted). Generally, "pure opinion" is constitutionally protected. *See Swengler*, 993 F.2d at 1071; *Daniels v. Metro Mag. Holding Co.*, 179 N.C. App. 533, 540 (2006) (holding that "loose, figurative, or hyperbolic" statements are opinion) (citation omitted).

Even when published in the form of an opinion, however, assertions of objective fact are actionable. *Desmond*, 375 N.C. at 67; *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 18-19 (1990) ("Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact.").

Moreover, statements of opinion that imply the existence of facts—or "mixed opinions"—are actionable. *Milkovich*, 497 U.S. at 21 ("It would be destructive of the law of libel if a writer could escape liability for accusations of defamatory conduct simply by using, explicitly or implicitly, the words 'I think.'"); *Swengler*, 993 F.2d at 1071 ("Statements clearly implying the existence of facts are actionable as defamation."); *Desmond*, 375 N.C. at 67. Such statements are actionable if "reasonably understood as implying the assertion of the existence of undisclosed

facts about the plaintiff that must be defamatory in character in order to justify the opinion." Restatement (Second) of Torts § 566 cmt. (b).

The seminal case on the opinion-fact distinction is *Milkovich*. There, the Supreme Court considered an article in an Ohio newspaper, framed as an opinion, implying the plaintiff lied under oath. *Milkovich*, 497 U.S. at 3. The Court declined to recognize an "artificial dichotomy between 'opinion' and fact," holding that there is no "wholesale defamation exemption for anything that might be labeled 'opinion'" because it would "ignore the fact that expressions of 'opinion' may often imply an assertion of fact." *Id.* at 18-19.

> If a speaker says, "In my opinion John Jones is a liar," he implies a knowledge of facts which lead to the conclusion that Jones told an untruth. Even if the speaker states the facts upon which he bases his opinion, *if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact*. Simply couching such statements in terms of opinion does not dispel these implications; and the statement, "In my opinion Jones is a liar," can cause as much damage to reputation as the statement, "Jones is a liar."

*Id.* (cleaned up) (emphasis added). Most importantly, *Milkovich* directs that the dispositive question is whether a reasonable factfinder could conclude that the statements *imply* false facts. *Id.* at 21.

The North Carolina Supreme Court also considered the opinion-fact distinction in *Desmond*. There, the defendant reporter asked experts hypothetical questions, which they answered on the assumption that the facts of the hypothetical

were true even though they were allegedly false. *Desmond*, 375 N.C. at 38. The experts' statements were then quoted in an article without the qualifying context. *Id.* at 38-39.

The court held that "in these instances, an expert's opinion that by itself would not have been actionable is actionable here because defendants published *an assertion of fact* that the expert made a *statement of opinion* that they did not state." *Id.* at 67. In such instances "'the sting' is in the attribution alone—the false *assertion of fact* that an expert in plaintiff's field holds an *opinion* critical of plaintiff." *Id.* But more than simply the false attribution, the article was actionable on a second level: an "underlying assertion of fact" that defamed the plaintiff. *Id.* at 68.

The operative question, under both *Milkovich* and *Desmond*, is whether a statement of opinion could "imply a false assertion of fact." Here, the Credit Reports imply that there are facts that support D&B's "opinions" in the form of ratings and scores. As in *Desmond*, not only are those implied facts false, but the implication that supporting facts even exist at all is *itself* false—in fact, as the Carroll Companies have alleged, many of the underlying facts implied by D&B do not exist.

      **i.**    **D&B's entire business model relies on implied facts underlying the ratings.**

To analyze the statements in the Credit Reports, "the court must view the words within their full context." *Desmond v. News & Observer Pub. Co.*, 241 N.C. App. 10, 16 (2015) (citation omitted). In analyzing the statement within its full

31

context, the court takes a holistic approach and looks to the broader social context, tone, and apparent purpose. *Davis*, 24 N.Y.3d at 270.

Although some circumstances may support a conclusion that a statement is opinion (e.g., a debate-oriented talk show or an op-ed), other situations may signal to the reader that the statements are based in fact (e.g., an extensive report on a company's credit). *See, e.g., id.* at 273 (reasoning that the statement was actionable because the speaker was a well-respected, exalted member of the community and well placed to have the facts he implied). Indeed, "it is one thing to be assailed as a corrupt public official by a soapbox orator and quite another to be labelled corrupt in a research monograph detailing the causes and cures of corruption in public service." *Ollman v. Evans*, 750 F.2d 970, 983 (D.C. Cir. 1984) (cleaned up).

Here, even before considering the specific details of the Credit Reports, the full context of the publication and D&B's business model implies facts and establishes the statements as mixed opinion. Like in *Davis*, where the defendant was a well-respected member of the community with opportunity to know the implied facts, a reasonable reader utilizes D&B's service for its promise of quality, data-driven assessments that are heavily relied upon by the federal government and many others. D&B's customers are paying for more than pure opinion; they are paying for analysis based in facts and data. Thus, the full context encourages the reader "to be

less skeptical and more willing to conclude" that the Credit Reports imply facts. *See Davis*, 24 N.Y.3d at 273.

As alleged in the Proposed Amended Complaint, D&B's marketing of the Credit Reports makes such a reading all the more reasonable. D&B's emphasis on robust data is evident through its promotional materials: "verified," subject to "strict data-governance policies," "curated from tens of thousands of sources," reports that allow "data-driven decisions," etc. (JA143). Indeed, D&B boasts that its Credit Reports foster "quick, highly-insightful credit decisions *based on quality data* and insights." (JA143 (emphasis added)). It is hard to imagine a statement that more clearly implies the existence of facts than a marketing scheme emphasizing the "quality data" underlying the opinion.

The unavoidable conclusion that the Credit Reports are mixed opinion is reinforced by D&B's business model relying on that exact impression. To put it simply, no one would pay for the Credit Reports to get pure opinion devoid of underlying facts and data. When viewed in the full context of their purpose and marketing, the Credit Reports clearly imply the existence of underlying facts.

### ii.    The text of the Credit Reports implies the existence of facts underlying the ratings.

After considering the context, the next step is to analyze the statements in the Credit Reports themselves. Again, *Milkovich* and *Desmond* provide helpful illustrations. For example, the phrase "In my opinion John Jones is a liar" implies a

knowledge of facts that lead to the conclusion that Jones told an untruth, and as such, the implication of fact is actionable. *Milkovich*, 497 U.S. at 18-19. Likewise, the phrase "the bullets could not have been fired from the same firearm" implies a knowledge of fact that supports the assertion. *Desmond*, 375 N.C. at 68. Such statements are actionable "if those facts are either incorrect or incomplete, or if [defendant's] assessment of them is erroneous." *See Milkovich.* 497 U.S. at 19.

Like in *Milkovich* and *Desmond*, the Credit Reports are replete with "opinions" that imply underlying facts. The Credit Reports assert that the Carroll Companies are financially unstable and likely to default on their obligations, implying such claims originate in fact. But it doesn't stop with just those "Risk Assessments"; the Credit Reports include further expressions of confidence and support that imply even more, and even more specific, underlying facts. For example, CIP's Credit Report asserts that the "Rating Confidence Level" for the Viability Rating is a "Robust Prediction," and the "Data Depth" comes from "Rich Firmographics," "Extensive Commercial Trading Activity," and "Basic Financial Attributes." (JA189). Moreover, the supporting text implies underlying facts—e.g., "low proportion of *satisfactory payment experiences* to total payment experiences," "*evidence* of negative trade," "proportion of slow payment experiences to total number of *payment experiences reported*," and "*payment information* indicates negative payment comments." (JA190) (emphases added).

Going further, the CIP Credit Report's "Trade Payments" section asserts that CIP has 70% "of trade within Terms" with a $2,500 past due account, supported by two graphs that break down CIP's "Payment Experiences," listing CIP's percent of payments that were paid late, among other data. (JA192-195).

Another example of implied facts is D&B's inclusion of precise statistical analyses supporting many assessments. CIP's Credit Report states that there is an 11.00% chance that CIP "will go out of business, become dormant/inactive, or file for bankruptcy or insolvency within the next 12 months." (JA187). And later, CIP's Credit Report states that the probability of delinquency is 15.79% (calculated to the *hundredth of a percent*). (JA187). These precise percentages imply supporting fact, especially when read in the context of D&B's service. Specifically, the precise statistical analysis implies that (1) there is some objectively verifiable metric by which D&B arrived at the rating—i.e., at the very least, one (undisclosed) number was divided by another (undisclosed) number to calculate the percentage; (2) D&B is in possession of factual information and documentation to support the rating; and (c) based on the verifiable metric, the factual information shows that each Carroll Company is a "HIGH" risk as compared to other companies rated by D&B.

A reasonable reader would not believe that the Credit Reports are "pure opinion" because such opinion—and the pages of foundation, data, and statistics— would be worthless without the accurate and detailed factual foundation that D&B

claims exists. This distinguishes this case from others where this Court found that a statement of opinion was not actionable because it did not sufficiently suggest knowledge of the underlying facts. *See, e.g.*, *Biospherics, Inc. v. Forbes, Inc.*, 151 F.3d 180, 184 (4th Cir. 1998) (distinguishing allegedly defamatory article from the article in *Milkovich* because it "contains no claim to first-hand knowledge of facts"). Therefore, as in *Desmond*, D&B uses the implication of an underlying factual basis to give a false impression of validation to its opinions maligning the Carroll Companies.

If D&B simply published the bare opinion that the Carroll Companies were financially risky, that would be constitutionally protected opinion; where, however, D&B implies in numerous ways that there are supporting facts, and when such facts are either verifiably wrong or non-existent, such implications are actionable as libel.

### iii. The Carroll Companies have sufficiently alleged that the facts implied by the Credit Reports are false.

Having established that the Credit Reports are statements of "mixed opinion" that imply the existence of supporting facts—rather than pure opinion—the next step is to analyze whether the Carroll Companies sufficiently alleged that those "mixed opinions" were defamatory.

In support of its conclusion that the Carroll Companies' proposed amendment was futile, the district court found that "[t]he Carroll Companies have not alleged sufficient facts to draw a plausible inference that the Dun & Bradstreet reports

contain or imply false, defamatory statements." (JA340). But the fact-based opinions contained in the false Credit Reports plainly do imply defamatory facts about the Carroll Companies—that they do not pay their vendors (or pay them on time), that they lack sufficient credit or resources to continue in their business, and that they are unable to pay their debts. These things are all clearly implied in the "opinions" reflected in the Credit Reports, and the Carroll Companies alleged that these implied statements are, indeed, false. (JA151-152) (allegation that the Credit Reports each "grossly understate and misrepresent" each Plaintiff's "commercial activities and payment history"; allegation that the Credit Reports "arbitrarily and falsely portray each Plaintiff as financial unstable and likely to default on its obligations to lenders and business partners").

Because D&B *refuses* to provide further information about the facts underlying its purported "payment histories" and "credit histories" to companies who refuse to be coerced into buying D&B products, these allegations are as specific as they can be at the pleadings stage. The district court erred when it failed to acknowledge that these and other allegations are more than sufficient "to draw a plausible inference that the Dun & Bradstreet reports contain or imply false, defamatory statements."

**iv.    Despite implications to the contrary, there are no facts supporting the Credit Reports.**

As established above, the numerous facts both stated and implied by D&B's Credit Reports are false and defamatory. However, as alleged in the Proposed Amended Complaint, not only are those implied facts false, but the very suggestion that D&B *has* any such facts is false. In fact, as the Carroll Companies allege, the statements of mixed opinion that impugn their businesses as unstable and financially unreliable are "arbitrary" and "untethered to any actual or purported factual information" whatsoever. (JA151, JA153, JA156, JA159, JA161, JA162, JA164).

This creates an entirely separate basis for concluding that the Credit Reports are defamatory. As the North Carolina Supreme Court held in *Desmond*, where a publication falsely claims the existence of factual support (i.e., claiming an expert offered an opinion he says he did not offer), the false implication of factual support is, itself, actionable. Thus, the Carroll Companies' allegations regarding D&B's implications of fact—in the absence of any such facts—plausibly alleges libel *per se*. *See Desmond*, 375 N.C. at 67.

D&B's admission that it has no financial statements from the Carroll Companies is not a get-out-of-jail-free card. (*See, e.g.*, JA199). That acknowledgment does not, as the district court incorrectly concluded, remedy the falsity of the Credit Reports, given that they still indicate (falsely) to readers that

38

D&B possesses other negative information about the financial condition of the Carroll Companies.

### III. The Credit Reports' underlying falsities are not corrected by vague language and disclaimers.

Even if the Credit Reports include some "pure opinion," the underlying facts—both stated and implied—make them actionable. As to these facts, however, the district court denied the motion to amend on the basis that the Credit Reports are substantially true when the associated labels and disclaimer are considered. (JA338). In particular, the district court pointed to D&B's disclaimer—"[t]he public record items contained in this report may have been paid, terminated, vacated, or released prior to the date this report was printed"—as sufficient to render the Carroll Companies' allegations of falsity "implausible." (JA338). The court's reliance on these disclaimers and labels was erroneous.

### A. D&B's disclaimer does not remedy the defamatory import of its false statements.

When deciding whether a disclaimer negates the defamatory import, the overall article must be considered in its totality and in context. *Stanton*, 438 F.3d at 125. Specifically, the court must consider the medium by which the statement is disseminated and the audience to which it is published. *See id.* at 125. However, the context of the additional detail is only considered in light of the fact that readers may read "so hastily or imperfectly as not to realize its full significance." Restatement

(Second) of Torts § 563 cmt. (d). Therefore, a disclaimer is merely "one of many signals the reasonable reader may consider in evaluating a publication." *New Times, Inc. v. Isaacks*, 146 S.W.3d 144, 161 (Tex. 2004).

There are several circumstances in which a disclaimer may not remedy a false statement. Among other reasons, a disclaimer may not be read. *Stanton*, 438 F.3d at 125-26. ("[W]e cannot assume, as the district court did, that placing a disclaimer on the first page of an article itself ensures that a reasonable reader will see it. . . . Nor can we say that any reasonable reader who notices the disclaimer would necessarily read the crucial second sentence . . ."); *See Kaelin v. Globe Communications Corp*, 162 F.3d 1036, 1041 (9th Cir. 1998) (holding that a reasonable person could find that the qualifying language "was too far removed [17 pages] from the cover headline to have the salutary effect that [defendant] claims"); *Las Vegas Sun, Inc. v. Franklin*, 74 Nev. 282, 287 (1958) (concluding that a headline and leader were actionable because the public frequently reads only the introductory language of an article); Restatement (Second) of Torts § 563 cmt. (d) (noting that "the public frequently reads only the headlines of a newspaper or reads the article itself so hastily or imperfectly as not to realize its full significance"); *see also* SACK ON DEFAMATION § 2.4.6 (noting that the positioning of a statement is critical to the question of defamatory import).

Even if it is read, a disclaimer may be "too oblique to place the other paragraphs into a neutral context." *Koolvent Aluminum Prod., Inc.*, 1995 WL 227351, at *3 (reasoning that a reasonable reader could read the purported disclaimer as not disclaiming the false facts). Notably, this assessment does not account for whether the disclaimer makes the statement technically accurate because "determining whether an allegedly defamatory statement can reasonably bear that construction as matter of law should not be confused with a search for its meaning in the objective sense." *Stanton*, 438 F.3d at 127. Like the issue of defamatory import, the question is how a substantial minority of laypersons may interpret the disclaimer. *See Davis*, 24 N.Y.3d at 266-67; *King*, 400 Mass. at 718. Thus, the material issue in assessing the effect of a disclaimer is whether—even with the disclaimer—the communication is reasonably susceptible of a defamatory meaning because a reasonable reader would (1) not read the disclaimer, or (2) not interpret the disclaimer to negate the defamatory import.

Here, the disclaimer relied on by D&B—"[t]he public record items contained in this report may have been paid, terminated, vacated, or released prior to the date this report was printed" (JA197)—does not rectify the defamatory import of the false facts because of its distant location and vague content. The introductory summary of the Credit Reports states false facts separate from—and well before—any qualifying language. The "Legal Events" summary, located on the third page of the report and

seven pages before the full "Legal Events" page, makes false statements without any of the vague qualifying language or disclaimers included later in the Credit Report. (JA188). A reasonable reader who utilizes D&B's service for "quick, highly-insightful credit decisions" may only read the headlines and summaries while ignoring the supplemental language tucked away on later pages.

In CIP's Credit Report, for example, the "Legal Events" summary states that there are three "Suits" and four UCC filings. (JA188). A reasonable reader of the Credit Reports may only scan the Legal Events summary for the amount owed or the number of outstanding occurrences, while not continuing on to the qualifying language several pages later. *See Kaelin*, 162 F.3d at 1041; *Las Vegas Sun, Inc.*, 74 Nev. at 287.

Moreover, the vague disclaimers do not make the falsities substantially true. A substantial minority of readers—at the very least—may not understand or interpret the language to its full, technical extent, and instead reach a more reasonable interpretation: that D&B is disclaiming only errors that may occur because information changes during the time it takes to translate D&B's information gathering into a published report. It is reasonable to assume that D&B, which touts that it "continuously updates" its data, has updated that data more recently than eight years ago, and the disclaimer does not reasonably suggest that the information to which it pertains might be so outrageously outdated. In other words, the disclaimer

42

may reasonably be interpreted as protecting D&B from *recent* changes in the public records, and not as disclaiming the responsibility of ensuring the data and assessments are *ever* updated.

In refusing to consider that reasonable construction of the disclaimer, the district court failed to draw inferences in the Carroll Companies' favor and incorrectly determined their claims were futile.

### B. Vague labels do not remedy the defamatory import.

As with the disclaimer, D&B's vague descriptions and qualifications do not cure the false facts. On the face of the Credit Reports, labels such as "Date Status Attained," "Received Date," and "Filing Date" do not clarify that "pending" lawsuits are no longer pending. Nor can verbiage such as "Received Date" and "Filing Date" clarify that UCC filings are no longer active. At the very least, a substantial minority of readers may not interpret the labels to clarify the false facts to the extent necessary to make them substantially accurate.

Simply listing the "Filing Date" also does not eliminate the defamatory import of false facts. The descriptions of "pending" lawsuits, "unsatisfied" judgments, and UCC filings in the Credit Reports imply (in fact expressly state in plain language) that they are still active, and technical language does not remedy this implication. A reasonable reader may fail to notice these vague labels or recognize their alleged meaning, thereby interpreting the false facts in their defamatory sense.

Additionally, in evaluating the Credit Reports as a whole, it is important that D&B states its commitment to update the relevant facts. D&B's marketing of their data as "verified" and subject to "strict data-governance policies" generally implies a commitment to refresh the data so their assessments are up to date. (JA143). Even more directly, D&B explicitly asserts that the Credit Reports are "continuously updated." (JA143). Because a reasonable reader would believe that D&B is committed to frequently updating the data, vague labels such as "Date Status Attained," "Received Date," and "Filing Date" cannot rectify false data that is, in some cases, years out of date. (JA157-158).

The only question the Court must answer is whether, drawing all inferences in favor of the Carroll Companies, the underlying facts can *reasonably* be read as false when the Court considers the full context of the Credit Reports, the manner in which the statement is disseminated, and the audience to which it is published. As illustrated above, a business—paying for D&B's Credit Reports after being sold on its data-driven, verified, and updated reports—could reasonably read the underlying facts in their defamatory sense. Accordingly, the Proposed Amended Complaint stated a plausible claim for defamation and the district court should have allowed that claim to proceed.

**IV.    The Proposed Amended Complaint plausibly alleged claims for unfair and deceptive trade practices.**

The Carroll Companies' Fifth and Sixth Claims for Relief are both brought under the North Carolina Unfair and Deceptive Trade Practices Act. The UDTPA is intended to prevent "unfair or deceptive acts or practices in or affecting commerce." *Becker v. Graber Builders, Inc*., 149 N.C. App. 787, 794 (quoting N.C. Gen. Stat. § 75-1.1). UDTPA claims must sufficiently allege three elements: (1) an unfair or deceptive act or practice, (2) in or affecting commerce, which (3) proximately caused actual injury to the claimant. *Id.*. Here, the Carroll Companies sufficiently pleaded their Fifth and Sixth Claims for Relief.

### A. Plaintiffs' Fifth Claim for Relief stands with the libel claim.

The Fifth Claim for Relief alleges that the same facts giving rise to the Carroll Companies' libel claim also constitute unfair and deceptive trade practices in violation of the UDTPA. (JA178-179). North Carolina's courts have consistently held that libel that impeaches a party in its business activities is an unfair or deceptive act in or affecting commerce in violation of the UDTPA. *See Boyce & Isley, PLLC*, 153 N.C. App. at 36; *Ellis v. North Star Co.,* 326 N.C. 219, 226 (1990) (holding that complaint alleging business libel also stated a claim for unfair and deceptive trade practices).

As explained above, the Carroll Companies have sufficiently alleged that the Credit Reports are defamatory on their face because they falsely impeach the

financial stability and creditworthiness of the Carroll Companies. Because the Proposed Amended Complaint sufficiently states a claim for libel relating to the Carroll Companies' business activities, the Fifth Claim for Relief should survive as well.

### B. Plaintiffs' Sixth Claim for Relief was not futile.

The Sixth Claim for Relief is based on D&B's attempts to coerce the Carroll Companies into purchasing D&B's subscription products to improve the Credit Reports. (JA179-182). Regardless whether the Court agrees that the Carroll Companies have sufficiently stated a UDTPA claim arising from libel, this claim was sufficiently pleaded in the Proposed Amended Complaint and should survive.

### i.   D&B's conduct was in or affecting commerce.

There is no dispute that D&B's actions were in or affecting commerce. D&B is a commercial actor and the explicit purpose of its business credit reports is to affect commerce. Accordingly, this element is satisfied.

### ii.   D&B's conduct was unfair or deceptive.

Nor is there any dispute that the Carroll Companies sufficiently alleged unfair and deceptive acts. "Whether a trade practice is unfair or deceptive usually depends upon the facts of each case and the impact the practice has in the marketplace." *Marshall v. Miller*, 302 N.C. 539, 548 (1981). An unfair act "offends established public policy and is unethical or unscrupulous," and a deceptive act "has a tendency to deceive." *Becker*, 149 N.C. App. at 794. Proof of actual deception, however, is

not required. *S. Atl. Ltd. P'ship of Tennessee, L.P. v. Riese*, 284 F.3d 518, 535-36 (4th Cir. 2002).

Here, the Carroll Companies alleged that they informed D&B that the Credit Reports were false, but D&B refused to correct or remove the inaccuracies unless and until the Carroll Companies purchased its subscription products or provided D&B with private, protected information and a license to freely use it. As the FTC Complaint shows, this is D&B's standard business practice. D&B takes advantage of its own false, unsourced reporting to coerce businesses, like the Carroll Companies, into both paying D&B to correct false information and giving D&B confidential business information that D&B uses to its own benefit (and for no benefit of the companies providing the information).

In other words, with the Carroll Companies and with an untold number of others, D&B uses its own false reporting to coerce payments from businesses who have little other practical choice to "fix" the problem D&B itself created. As the FTC has recognized, "[c]redit reports can be make-or-break for small businesses." *Hearing on Oversight of the FTC Before the H. Comm. on the Judiciary*, 118th Cong. (July 13, 2023) (statement of the FTC, at 35), https://www.ftc.gov/system/files/ftc_gov/pdf/p210100housejudiciarytestimony07132023.pdf.[2] That is

---

[2] The Court may take judicial notice of public records published on government websites, and the Fourth Circuit routinely does so. Fed. R. Evid. 201; *see also Hall*

because many businesses rely on D&B's credit reports to entice business partners, finance loans, and more. (JA142-145).

Essentially, D&B poisons innocent businesses so it can sell them the antidote—and in doing so, it extracts a premium. That is quintessentially unfair and deceptive conduct.

### iii.    D&B's conduct caused actual injury to the Carroll Companies.

The district court held that the Carroll Companies had not sufficiently alleged an injury in connection with its Sixth Claim for Relief. In so holding, the district court viewed their allegations of injury too narrowly.

"Injury" in the context of a UDTPA claim includes more than just monetary damages. To satisfy the injury element, a plaintiff must only allege "that the act of deception proximately resulted *in some adverse impact* or actual injury to the plaintiffs." *Walker v. Sloan*, 137 N.C. App. 387, 399 (2000) (emphasis added). As one North Carolina court has explained:

> Impact on the market place is not to be equated with the damages legally recoverable. Impact on the market place speaks more to the effect unethical practices have on business activity than to value of the damage done. . . . Acts that diminish public confidence in a business transaction and enterprise may have an

---

*v. Virginia*, 385 F.3d 421, 424, n.3 (4th Cir. 2004) (taking judicial notice of information publicly available on official government website); *United States v. Garcia*, 855 F.3d 615, 621 (4th Cir. 2017) ("This court and numerous others routinely take judicial notice of information contained on state and federal government websites.").

48

impact on the market place, as business stability depends on public confidence. Defendants' acts obviously caused a significant segment of the public to lose confidence in their contracts with plaintiffs and in plaintiffs as reliable real estate developers. That the diminished confidence in plaintiffs' business reliability may have been of short duration, due to plaintiffs' alacrity in alleviating the minor problems that existed, does not erase the baleful impact that defendants' actions had.

*Pinehurst, Inc. v. O'Leary Bros. Realty*, 79 N.C. App. 51, 61 (1986) (cleaned up).

Moreover, as the district court itself recognized, a UDTPA claim may lie even when there are only nominal damages. (JA342); *see also, e.g.*, *Pinehurst Inc.,* 79 N.C. App. at 60-61 (finding for Plaintiff on UDTPA claim even though "only nominal damages resulted therefrom"); *Hongda Chem USA, LLC v. Shangyu Sunfit Chem. Co.*, Ltd, No. 1:12-CV-1146, 2020 WL 1150214, at *7 (M.D.N.C. Mar. 10, 2020) (finding $1 in nominal unfair trade practices damages, trebled to $3). In *Pinehurst*, which the district court cited, "plaintiffs offered no proof as to the monetary value of their damages" yet the court concluded they suffered "$1.00 or more" in damages from "a disruption of their business, loss of administrative time, and injury to their business reputation." *Pinehurst, Inc.*, 79 N.C. App. at 64. Along with those categories, plaintiffs suffered damages "in counsel fees expended in an effort to stop and restrain further publication of the [deceptive letter]." *Id.* at 56.

Following these principles, the North Carolina Court of Appeals has held that "allegations of wrongful and intentional harm to [a plaintiff's] credit rating and

business prospects" are sufficient to establish injury for purposes of a UDTPA claim. *See Talbert v. Mauney*, 80 N.C. App. 477, 481 (1986).

The district court found that the only injury alleged by the Carroll Companies with respect to their Sixth Claim for Relief was that they had to incur the cost of hiring an attorney to file suit against D&B, specifically citing to *Pinehurst's* actual injury categories of "business disruption" and "loss of administrative time" for injuries the Carroll Companies did not allege. (JA342). But in so holding, the district court ignored the Carroll Companies' allegations that they had "invested substantial time and money into bringing this lawsuit," as well as in writing to D&B "notifying it of inaccuracies in the Plaintiff Credit Reports and demanding D&B cease and desist from publishing the false and defamatory reports." (JA171, JA166). These allegations of "business disruption" and "loss of administrative time," if proven, are sufficient to establish that D&B purposefully injured the Carroll Companies' business and reputation in order to profit.

The district court also ignored the injury inherent in being coerced to repair one's credit through the manipulation of knowingly false statements. As referenced in the FTC's statement above, credit reports can "make or break" small businesses. D&B's unlawful scheme depends on exploiting the vulnerable situation of such businesses by means of a potential crisis that D&B causes and claims that only it can

50

fix. Being put in that position alone is an "adverse impact" that creates a cognizable claim under the UDTPA.

For the foregoing reasons, the Sixth Claim for Relief in the proposed Amended Complaint sufficiently stated a UDTPA claim and such claim therefore is not futile.

## V.    The original Complaint plausibly alleged claims for libel and for unfair and deceptive trade practices.

Finally, the district court erred in dismissing the original complaint with prejudice for the same reasons it erred in denying the Rule 59 motion. Generally, complaints that fall short of meeting the applicable pleading standard should be dismissed *without* prejudice.

> The federal rule policy of deciding cases on the basis of the substantive rights involved rather than on technicalities requires that plaintiff be given every opportunity to cure a formal defect in his pleading. This is true even though the court doubts that plaintiff will be able to overcome the defects in his initial pleading. Amendment should be refused only if it appears to a certainty that plaintiff cannot state a claim. The better practice is to allow at least one amendment regardless of how unpromising the initial pleading appears because except in unusual circumstances it is unlikely that the court will be able to determine conclusively on the face of a defective pleading whether plaintiff actually can state a claim.

*Ostrzenski*, 177 F.3d at 253 (quoting 5A Charles Allen Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE § 1357, at 360-67 (2d ed. 1990)).

The original complaint alleged claims beyond the speculative level, thereby nudging the claims across the line from conceivable to plausible. *See Twombly*, 550 U.S. at 555. But the district court misapplied the appropriate legal standard and incorrectly dismissed the complaint with prejudice. Specifically, the district court erred in concluding that "a reasonable reader would understand the reports to be Dun & Bradstreet's subjective assessment." (JA124). In so ruling, the district court heavily relied on this Court's decision in *Biospherics* for the opinion-fact distinction.

> In *Biospherics,* the Fourth Circuit . . . concluded that the tenor and context of the article favored a conclusion that the statement was opinion because the article adopted a "*breezy rather than solemn tone*," had an *unserious title*, "Sweet-Talkin' Guys," and the tip was accompanied by an *illustrated arrow pointing out the writer's recommendation* to buy or sell the stock. Next, the court reviewed the language used, such as characterizing the plaintiff's statements as "*[h]ype and hope* for a natural, noncaloric sugar–called Sugaree–that the company's been 'developing' for 15 years." This, too, showed the statement was opinion, since "hype and hope" is the type of "*irreverent and indefinite language*" that negates "the impression that the writer is stating fact."

(JA120-121 (citations omitted) (emphasis added)).

But in reality, this Court's analysis in *Biospherics* illustrates how the Credit Reports can be distinguished from typical opinions. The magazine advice column at issue in *Biospherics* featured a "breezy" tone, unserious title, and "cute" and "imprecise, casual language." *Biospherics*, 151 F.3d at 185-86. In contrast, and as portrayed in the original complaint, the Credit Reports are paid informational analyses instructing businesses on the financial stability of the Carroll Companies.

Moreover, the tenor and context of the Credit Reports include none of the "irreverent and indefinite language . . . that negates the impression that the writer is stating fact" present in *Biospherics*. *Id.* at 184-85. The *Biospherics* Court held that the "article contains no claim to first-hand knowledge of facts," which leads to the conclusion that no reader would "consider the term anything but the opinion of the author." *Id.* at 184-85. In this case, the Carroll Companies sufficiently alleged that the Credit Reports contain purported first-hand knowledge—in fact, D&B's entire business is based on knowing supposed facts.

The district court correctly noted that the *Biospherics* holding was supported by "the lack of a challenge to the accuracy of the underlying information." (JA121). The *Biospherics* court concluded that "the article clearly disclosed the factual bases" for the opinion and "Biospherics does not challenge their accuracy." *Id.* at 185. The district court held that the Carroll Companies' original complaint was insufficient on this issue, a deficiency that was plainly addressable with an amended pleading (and was addressed in the Proposed Amended Complaint).

Additionally, for the reasons described above, the district court erred in denying the UDTPA claims. The Fifth Claim should have survived because libel that impeaches a party in its business activities is an unfair or deceptive act in or affecting commerce in violation of the UDTPA. *See Boyce & Isley, PLLC*, 153 N.C. App. at 36. Similarly, the Sixth Claim stands regardless of the libel claims because the court

erred in its analysis of the Carroll Companies' actual injury. *See Pinehurst*, 79 N.C. App. at 60-61.

**CONCLUSION**

For the foregoing reasons, the district court's order denying Plaintiffs' motion to alter or amend the judgment to allow leave to file an amended complaint should be reversed. In the alternative, the district court's order granting Defendants' motion to dismiss with prejudice should be reversed.

**REQUEST FOR ORAL ARGUMENT**

Because of the substantial and novel legal issues raised by this appeal, Appellants respectfully request oral argument.

Respectfully submitted this 18th day of June, 2024.

> BROOKS, PIERCE, McLENDON,
>  HUMPHREY & LEONARD, L.L.P.
>
> By: /s/ Eric M. David
> Eric M. David
> N.C. State Bar No. 38118
> edavid@brookspierce.com
> Andrew L. Rodenbough
> N.C. State Bar No. 46364
> arodenbough@brookspierce.com
> Pearson G. Cost
> N.C. State Bar No. 60828
> pcost@brookspierce.com
> Post Office Box 1800
> Raleigh, North Carolina 27602
> Telephone: 919-839-0300
> *Attorneys for Plaintiffs-Appellants*

**<u>C</u>ERTIFICATE OF <u>C</u>OMPLIANCE WITH <u>T</u>YPE-<u>V</u>OLUME <u>L</u>IMIT**

1.  This brief complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

    [X] this brief contains 12,292 words

2.  This brief complies with the typeface and type style requirements because:

    [ X ] this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14 pt. Times New Roman.

    Dated: June 18, 2024                    /s/ Eric M. David
                                            *Attorney for Plaintiffs-Appellants*